**Carol PRYCE, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 139, Docket 77–4084.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1977.

Decided Jan. 12, 1978.

Richard J. Madison, New York City (Gerald Kaiser, P. C., New York City, of counsel), for petitioner.

Richard J. Leon, Sp. Asst. U. S. Atty., Brooklyn Heights, N. Y. (Robert B. Fiske, Jr., U. S. Atty., and Patrick H. Barth, New York City, of counsel), for respondent.

Before MANSFIELD and TIMBERS, Circuit Judges, and DOOLING,* District Judge.

DOOLING, District Judge:

Carol Pryce has petitioned under 8 U.S.C. § 1105a to review an order of the Board of Immigration Appeals dismissing his appeal from an order of the Immigration Judge that he be deported pursuant to 8 U.S.C. § 1251(a)(13). That section provides:

"(a) Any alien in the United · States . . . shall, upon the order of the Attorney General, be deported who—

\*    \*    \*    \*    \*    \*

* Of the Eastern District of New York, sitting by designation.

"(13) . . . at any time within five years after any entry, shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law . . ."

The administrative record, upon which the appeal must be determined (8 U.S.C. § 1105a(a)(4)), is clear that Pryce, then a twenty-three year old native born citizen of Jamaica, did actively assist in the unsuccessful attempt of Keith Grizzle, an alien, to enter the United States in violation of law. The question presented is: Is the administrative finding that Pryce acted for gain "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (8 U.S.C. § 1105(a)(4))? The statute provides that, "no decision of deportability shall be valid unless it is based upon reasonable substantial, and probative evidence." (8 U.S.C. § 1252(b)(4)). Upon review of a deportation order, the Attorney General's findings of fact are, under 8 U.S.C. § 1105a(a)(4), conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole. The Court has held in *Woodby v. Immigration and Naturalization Service,* 1966, 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 that neither the Board of Immigration Appeals nor the Immigration Judge may enter a deportation order

" . . . unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true."

There is no disagreement that on October 1, 1973, petitioner went to Toronto with Leroy ("Kilo") Stefus, and gave to Keith Grizzle, a Jamaican who could not lawfully enter the United States, a driver's license, Xerox Corporation employee identification card, and a blood donor's card, all in the name of *Manning McCutchen, Jr.*; that he instructed Grizzle that, if questioned, he was to say that he had been born in Miami, Florida, and worked for Xerox Corporation in Rochester; and that he then relieved Grizzle of his luggage and passport and flew back to the United States, leaving Grizzle and Kilo to return by automobile via

Lewiston Bridge. There Grizzle was questioned about his citizenship, he and Kilo were arrested, and Grizzle gave a statement to an Immigration Investigator. Petitioner's arrest followed. Before the institution of deportation proceedings, petitioner was tried and convicted of violations of 8 U.S.C. § 1324(a)(1) and 18 U.S.C. § 371, and served a one-year sentence in jail. The government did not have to prove in the criminal proceeding that petitioner had acted "for gain".

The central figure in the transactions was Monica Terill Pryce. She had lived with petitioner's brother, Barrington Pryce, in Jamaica, and borne him two children. Barrington Pryce had come to the United States, and, apparently in order to facilitate Monica Terill's entry into the United States, Carol Pryce married her in Jamaica in 1971. Not, however, until June 30, 1973, was Monica Terill Pryce admitted to the United States. After a brief residence in Carol Pryce's house, Monica Pryce, who had been living with Keith Grizzle in Jamaica until her emigration and had borne him a child, established her own separate residence in Rochester. Grizzle did not seek entrance to the United States, but in mid-September 1973 went to Toronto, Canada, where his sister lived. Monica Pryce visited him there, and discussed with Grizzle getting someone to help Grizzle get into the United States. Monica Pryce asked petitioner if he knew anyone who could "sponsor" Grizzle's immigration, or could help get Grizzle into the United States. Petitioner evidently located Leroy Stefus. Keith Grizzle testified that he understood that a payment of $300 was involved of which he was to pay $150 and Monica Pryce was to pay $150. At the time of the arrests no money had been paid by or to anyone.

The Immigration Judge heard the testimony of petitioner, Keith Grizzle, and William "Devarney" an investigator with the Immigration and Naturalization Service, and he received in evidence the statement of Keith Grizzle, given on October 1, 1973,

the day of his arrest, and the statement of Monica Pryce, taken on November 10, 1973. Monica Pryce died on January 30, 1975, more than nine months before the hearing before the Immigration Judge.

Keith Grizzle's statement was to the effect that Monica Pryce wrote to him that he could come to the United States by first going to Canada, that someone would help him enter the United States, and that it would cost him $300 for this help. In the statement he said further that when he saw Monica Pryce in Toronto on the weekend of September 15, 1973 she again told him that someone would go to Toronto to help him enter the United States, and that she telephoned him in the last week of September that someone would be in Toronto on October 1st to pick him up. In the statement, which was taken in question and answer form, Grizzle said that Carol Pryce had not asked for any money for the false identity cards, nor had he told Grizzle that he would have to pay him, Pryce, at any time for the cards, nor had either of the other two people (Stefus and an unidentified woman) mentioned money to him, Grizzle. At the hearing Grizzle testified that he knew when he got the false identity cards that he would have to pay $300 for them but did not know whom he would have to pay; that he had only $150, which was the amount he would pay, and Monica Pryce was to pay the other $150; that later, when he reached Rochester, Monica Pryce told him that he was to have paid his $150 to Carol Pryce. He testified that he had not asked Stefus, who drove him to Lewiston Bridge, anything about money. He thought, he testified, that he might have repeated Monica Pryce's statement that he was to have paid Carol Pryce to the investigator, "Devarney", but he could not recall whether he had been questioned on the point during Carol Pryce's criminal trial based on the attempt to bring Grizzle into the country illegally.

Petitioner Carol Pryce testified to his conviction in the related criminal case and to supplying the false identity cards to Grizzle in Toronto; he said that he was not to get anything in return for his service to Grizzle, whom, he said, he did not know,[1] and that his "common-law wife asked me to help her and I tried my best." Petitioner testified that he did not inform Monica Pryce of the "fees that she would have to pay for this help" because he did not know what they were, and that he received no money from anybody. Carol Pryce testified that he worked for Kodak and then for Xerox for three years until August 1974 when he was laid off.

The Immigration Judge received in evidence the statement of Monica Pryce, taken on November 10, 1973, before Investigator William C. Devine; Keith Grizzle was present, at Monica Pryce's request, when the statement was taken and Investigator Lawrence Solinski was also present. She stated that she had lived with Grizzle in Jamaica from 1968 to 1973, when she came to the United States, that Grizzle told her on the telephone, after she was in the United States, that he would visit his sister in Canada, whereupon she told him that she would visit him there every other weekend; that Grizzle, in Canada, told her that he would like to go to Rochester if she could get someone to "sponsor" him; and that when petitioner asked her about her visit to Canada, she asked petitioner if he knew anyone who could "sponsor" a friend for her, and "him say him don't know anybody but he see if he get someone to sponsor him." She stated that a few days later petitioner "said he had a friend", that he said, "I get someone who could help, help your friend, you know . . .. Here's what him say will cost you, $300.", and that she responded, "All right, I will get in touch with Keith and he will pay his part and I will pay the rest later on." She stated that petitioner got Keith's personal data and

1. Grizzle said in his October 1, 1973, statement that he knew Carol Pryce "from Jamaica". Monica Pryce said in her statement that Carol Pryce told her that he did not know Keith Grizzle.

Canadian address from her, and identified his "friend" as Kilo. The transcript continues:

"Q. At any of these meetings with Carol Pryce, did you discuss payments of the $300?

A. Yes, he said I would give him the money. When he reached Canada, Keith would give them the money but that don't know them who.

Q. Did he say how you were to pay your share of the money?

A. No. I didn't tell him. I didn't tell him all. You see, I would look about that as soon as Keith came over.

Q. Then, Mrs. Pryce, your understanding was from your husband that the friend would go to Canada to pick up Keith Grizzle, that upon arriving in Rochester, Keith Grizzle would pay the $150 as his share, that you would pay the additional $150 as your share when the time came?

A. Yes.

Q. Did you tell Keith Grizzle this arrangement?

A. Yes.

Q. When did you tell him?

A. The 25th of September.

Q. And was this agreeable with him?

A. Yes."

Returning to the topic later in the course of the statement, the transcript reads:

"Q. Once more I would like to ask you about the conversation which you had when he told who would bring Keith to the United States. Would you repeat the conversation for me?

A. He said he had a friend who could help me. He said his friend is 'Kilo.' He said he would ask from Kilo if he would take the money, how I have said I would pay it. Well, he really didn't discuss anything more to me,

concern more than that what we agreed.

Q. Did he subsequently tell you that Kilo had agreed to the terms in which you said Keith would pay the $150, and you would pay another $150 at a later date?

A. Yes."

\* \* \* \* \* \*

"Q. Was any of the money that was agreed upon paid to Carol Pryce or to the person known as Kilo? I'll repeat the question. Was any of the $300, that was agreed upon for bringing Keith to the United States paid to Kilo or to Carol Pryce?

A. No."

The statement of Monica Pryce was offered through the testimony of William "Devarney", an Immigration and Naturalization Service Investigator, after proof, by certificate, that Monica Pryce had died on January 30, 1975, in a hospital in Rochester. Devarney said that he had taken Monica Pryce's statement[2] on November 10, 1973, and that Grizzle, Monica Pryce and trainee Investigator Solinski were also present. The statement was objected to, and it was received on the basis of the affiant's unavailability supported by the circumstance that the affiant had appeared as a witness and had been cross-examined at Carol Pryce's criminal trial; the Immigration Judge stated that he would give it less than the amount of belief that he would if the person was available to testify.

Devarney testified that the Monica Pryce statement was not taken by a stenographer but by an Edison Voicewriter and was not given to Monica Pryce to read and sign after it was transcribed. (The Service offered to submit the actual recording to the Immigration Judge.) Devarney was asked where in her statement Monica Pryce said that the money was supposed to be paid to petitioner. He pointed to the first question

2. The statement gives the name of the Investigator before whom the statement was taken as "William C. Devine". The apparent discrepancy was not commented on by the Immigration Judge or the Board of Immigration Appeals.

and answer quoted above. Asked if he knew what Monica Pryce's answer meant, Devarney answered

"Yes, it means that she didn't know who the person particularly Kilo was suppose to get the money."

Devarney was then asked to read the next question and answer also quoted above.

The Immigration Judge disposed briefly of other issues and then said that the "sole remaining issue is whether gain has been established by clear, unequivocal and convincing evidence". After stating that petitioner had testified that he did not accept or receive anything for his services but had acted to assist a woman he had married and helped to enter the United States as a permanently resident immigrant, he continued:

"The smuggled alien, Keith Grizzle, testified contrary to respondent that he knew that he would have to pay $300 and half was to be paid to respondent upon entry into the United States. Additionally, an Immigration Investigator testified to taking a statement from respondent's wife (who is deceased) which reflects the same facts as stated by Mr. Grizzle. The smuggled alien's testimony is thereby corroborated sufficiently to overcome convincingly respondent's denial. It is therefore found, upon clear, convincing and unequivocal evidence, respondent acted on a promise of gain to aid, abet, and assist Keith Grizzle to illegally attempt to enter the United States."

The Board of Immigration Appeals, treating William Devarney and William C. Devine as the same person, as, arguably, they must be, relied largely on Devine's reading and interpretation of the November 10, 1973, Monica Pryce statement, and on Grizzle's testimony as corroborating her statement. Said the Board:

"The immigration judge is primarily the trier of fact and is in the best position to judge the demeanor and credibility of witnesses. We have consistently held that 'credibility' involves more than simple demeanor, rather, it concerns an over-all evaluation of the testimony of the various witnesses in the light of its rationality, internal consistency and the manner in which it hangs together with other evidence. . . .

"Upon evaluating and weighing the evidence submitted by the Service and the respondent, pursuant to the above guidelines, we find that the evidence adduced by the Service is more credible than that introduced by the respondent. Based on this finding we, conclude that there is clear, convincing and equivocal evidence that the facts alleged as grounds for deportation are true."

The "corroboration" is not free of difficulty. Grizzle said only that after the arrests Monica Pryce told him that she was to have paid $150 to Pryce and that he in turn, told that to Devarney (Devine) in Rochester, that Devarney wrote the questions down and that he, Grizzle, thought he had signed something. However, the Government had no second statement, and, while Devarney had spoken to Grizzle six or seven times after Grizzle's October 1, 1973, statement was taken (by Investigator Corcoran), Devarney could not recall that Grizzle said anything that he considered important after the statement given to Corcoran.

Stefus was not called as a witness, and the record indicates that his whereabouts were unknown. But the record also indicates that he had given a statement, and that statement was not offered. Apparently the transcript of petitioner's criminal trial was not produced; Monica Pryce had testified, and, although "gain" was not an issue in that trial, any circumstantial account of the events might have thrown light both on petitioner's role and Monica Pryce's understanding of it.

On the administrative record, considered as a whole, the findings under review are not supported by that reasonable, substantial and probative evidence required to sustain the deportation order. The administrative record, moreover, exhibits a failure on the part of the Board and the Immigration

Judge to apply the correct standard of proof, a failure, that is, to require the production of clear, unequivocal and convincing evidence to support the deportation order. The order depends on Monica Pryce's statements and they are at best equivocal. The outline of her statement is clear; it may be accepted that she understood and said that she was to have "paid" $150 to petitioner. But the further and immediate question, for whom, for whose advantage, is wholly unanswered. It is consistent with Monica Pryce's statement that petitioner was to receive the money simply to pay it over to Stefus ("Kilo") and his suppliers, and that interpretation is more consistent with the whole of Monica Pryce's statement. Petitioner had to seek someone out to bring Grizzle in. When he found someone, he allegedly reported to Monica Pryce, "Here's what him say will cost to you, $300." That is not genuinely suggestive that there was any share for petitioner. The later recital is in the same frame: "He said his friend is 'Kilo'. He said he would ask from Kilo if he would take the money, how I have said I would pay it. Well, he really didn't discuss anything more to me, concern more than we agreed." And the follow-up affirmative answer to the summarizing question, which was that petitioner later told her that "Kilo had agreed to the terms in which you said: Keith would pay the $150, and you would pay another $150 at a later date", again appears affirmatively to exclude petitioner from a share in the fee that Kilo fixed.

The interrogation of petitioner himself did not explore the details of the $300 arrangement and mode of payment. Petitioner was examined on the other elements of the charge, and, of course, freely admitted them. But the only question about the "fee", which evoked the answer that petitioner did not tell it to Monica Pryce because he did not know it, appears to have been related to the time of Monica Pryce's first request for help; the answer was, in that view of it, consistent with Monica Pryce's statement.

No just suspicion of a profit purpose attaches to the record of petitioner's action. The background is fully consistent with petitioner's having gratuitously rendered a very foolish service for which he has paid dearly.

The defect in the record in the present case is that the Board's conclusion is not supported by reasonable, substantial and probative evidence, and the record reflects a failure to apply the *Woodby* standard to the evidence of record. The Immigration Judge and the Board of Immigration Appeals did, indeed, articulate the appropriate standard of proof (*Kokkinis v. District Director,* 2d Cir. 1970, 429 F.2d 938, 942), but failed to apply it in analyzing the meagre record of ambiguous and hearsay statements before it, and in evaluating the effect of the gaps in the evidence.

The government contends that when it showed that $300 was to be paid, it made out a *prima facie* case that petitioner had acted "for gain" and that the burden shifted to petitioner to introduce evidence that he would not have retained a profit if the scheme had been completed. However, we need not reach the issue of the burden of producing evidence of gain in this case. Here the government failed to adduce any substantial or probative evidence that Pryce, as distinguished from Stefus ("Kilo") or someone else, was ultimately to receive the money.

The decision of the Board of Immigration Appeals is reversed and the deportation order of the Immigration Judge is vacated.